SANDERS STATE BANK v. HAWKINS et al.

(Court of Civil Appeals of Texas. Texarkana. Dec. 7, 1911.)

1. OFFICERS (§ 114*)—JUDICIAL AND QUASI JUDICIAL OFFICERS—PERSONAL LIABILITY.

To hold a judicial or quasi judicial officer personally liable in a private action, it must appear that he transcended the limits of his power, but as long as he remains within the scope of his legal authority he is not liable, notwithstanding his motive; but, where an officer is influenced by improper or malicious motives in exceeding his authority, he is liable for the wrong inflicted.

[Ed. Note.—For other cases, see Officers, Cent. Dig. §§ 187–192; Dec. Dig. § 114.*]

2. OFFICERS (§ 114*)—ACTION FOR EXCEEDING POWERS.

A petition, in an action for private damages against a judicial or quasi judicial officer for exceeding the limits of his legal powers, must state facts showing a usurpation of authority, and that such usurped authority was knowingly assumed, or assumed in pursuance of improper or malicious motives.

[Ed. Note.—For other cases, see Officers, Dec. Dig. § 114.*]

3. PLEADING (§ 214*) — DEMURRER — ADMISSIONS.

A demurrer to a petition admits the truth of all the material facts alleged, but it does not admit mere conclusions of the pleader.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. § 527; Dec. Dig. § 214.*]

4. PLEADING (§ 8*)—CONCLUSIONS.

An allegation, in a petition by a domestic banking corporation against the Commissioner of Banking and a bank examiner for wrongfully closing the bank, that the officers acted without authority of law is a mere conclusion of the pleader; and whether or not they usurped their authority must be determined by measuring what they are charged with doing by what the law permits them to do.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 12–28½; Dec. Dig. § 8.*]

5. EVIDENCE (§ 83*)—PERFORMANCE OF OFFICIAL DUTY—PRESUMPTIONS.

Where the conduct of an officer is attacked as in excess of authority, and there are any conditions under which he may exercise the powers assumed, the court will presume, in support of the validity and regularity of his acts, that such conditions existed and formed the basis of his official conduct, and this presumption must be indulged in in favor of the regularity of an officer's conduct when he is sought to be held civilly liable for damages sustained by a private party.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 105; Dec. Dig. § 83.*]

6. BANKS AND BANKING (§ 17*) — REGULATION—PUBLIC OFFICERS—POWERS.

The act of 1905 (Laws 1905, p. 489), authorizing the supervisor of banking to close a bank when, from an examination, it is discovered that the bank is insolvent, or that its continuance in business will seriously jeopardize its depositors and creditors, requires the Superintendent of Banking, to close a bank when, in his opinion, from a personal examination, the bank is insolvent, or its continuance unsafe to depositors and creditors; and where an examiner, after examining a bank, makes a report to the Superintendent which reveals such conditions, and recommends the closing of the bank, the Superintendent, if approving the report, must close the bank, and in that respect is clothed with judicial functions; and where an examiner reported that the only resources of a bank were its stock, a large part or all of which had been loaned to private parties, and the remainder invested in other property, the bank, to hold the Superintendent and the examiner civilly liable in damages for closing the bank, must allege facts disclosing that they exceeded the authority conferred by law.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 17.*]

Appeal from District Court, Bowie County; P. A. Turner, Judge.

Action by the Sanders State Bank against W. E. Hawkins and another. From a judgment of dismissal, plaintiff appeals. Affirmed.

Hart, Mahaffey & Thomas, for appellant. Jewel P. Lightfoot, Atty. Gen., Jno. W. Brady, Asst. Atty. Gen., A. S. Hawkins, and Wm. E. Hawkins, for appellees.

HODGES, J. The appellant brought this suit against the appellees to recover damages which it claims to have sustained by reason of the closing of its banking house and the suspending of its banking operations by the appellees, while they were claiming to act under the law regulating state banks and trust companies. The petition alleges that the appellant was duly incorporated under the laws of Texas, during the year 1909, as a state bank; that it thereafter received a permit from the proper authority to engage in the banking business with its domicile and place of business in De Kalb, Bowie county, Tex.; that it had a paid-up capital stock of $10,000. The petition then proceeds as follows:

"That continuously from the date when the plaintiff first began business up to the 23d day of March, 1910, it did a banking business in compliance with and by authority of its charter and such certificate so issued to it, and that, on the 23d day of March, 1910, the plaintiff was a solvent and going bank, and that its business and affairs were so managed and conducted, so that in no degree were the safety or security of its depositors, creditors, or stockholders jeopardized. That on said date the resources of the plaintiff consisted of divers and sundry sums of money due it from other solvent banks and bankers in the total sum of $3,000, cash on hand, $225, and loans due it from solvent persons, $7,000, making the total amount of its resources, outsides of fixtures, stationery, etc., $10,250. That on the date aforesaid the liabilities of the plaintiff consisted alone of $10,000, its capital stock, and $225 due the state banking board.

"The plaintiff further alleges that it was then and there located in a prosperous town and county, was well located, had just fairly entered upon its business career. That its standing and credit were good in the financial world, and that its name and standing were good in the community where it

was located, and it had reasonable prospects of becoming a prosperous and paying institution, and of making money for its stockholders and conserving the interests of its depositors. That heretofore, on the said 23d day of March, 1910, the defendant W. E. Hawkins was, and for some time had been, the Commissioner of Insurance and Banking of the state of Texas, and on said date the defendant M. E. Hulsey was a bank examiner of the state of Texas. That on the said 23d day of March, 1910, or shortly prior thereto, the defendant W. E. Hawkins, pretending to act as Commissioner of Insurance and Banking, as aforesaid, and pretending to act by virtue of authority in him vested as such officer, but in truth and in fact acting without legal cause or authority, and with malice, and being prompted by motives of pique, spite, and ill will entertained by him against this plaintiff and some or all of its officers, and with the purpose and intent of injuring and harassing this plaintiff and some or all of its stockholders, ordered the defendant M. E. Hulsey, as bank examiner aforesaid, to proceed to De Kalb and close the plaintiff, and take possession of its assets. That the said M. E. Hulsey then and there, and all times thereafter, well knew the motives, purposes, and intentions of the said defendant Hawkins above charged; well knew that said defendant Hawkins was without legal authority to give such order; well knew there existed no legal or just cause for closing plaintiff and taking charge of its assets; well knew that the said Hawkins, in giving him such an order, was prompted by malice, spite, pique, and ill will which he then and there had and held against plaintiff, and against some or all of its officers; notwithstanding such knowledge on his part, however, the said defendant Hulsey, not repudiating, but sharing and entering into, the malice, spite, and illegal and wrongful purposes and intentions of the defendant Hawkins, as above charged, proceeded to De Kalb, Tex., and then and there, to wit, on the 23d day of March, 1910, unlawfully and wrongfully, and for the purpose of carrying out the aforesaid unlawful and malicious purposes and intentions of the defendant Hawkins, by force and arms, unlawfully (entered) into and took possession of that part of a certain brick building in said town of De Kalb, Tex., in which the business of the plaintiff was being conducted, and then and there took possession of the furniture and fixtures of said plaintiff therein situated, consisting of one set of mahogany bank fixtures, three office desks, one typewriter, one-half dozen chairs, carpets, and one cuspidor; and then also took into his possession all of the books and accounts of the plaintiff, its notes, amounting to $7,000, its evidences of money deposited with other banks, amounting to $3,000, and $225 cash on hand, also all of its stationery of every kind and character; and then and there excluded the plaintiff's officers from the part of such building where plaintiff conducted its business, and then and there closed and declared he had closed plaintiff, and thereupon posted on the door of plaintiff bank a notice in substance and to the effect as follows, to wit: 'This bank [the Sanders State Bank] is in charge of the Commissioner of Insurance & Banking of the state of Texas. W. E. Hawkins, Commissioner of Insurance & Banking, by M. E. Hulsey, Examiner.'

"The plaintiff further alleges that the defendants, after taking possession of its property, as aforesaid, and closing it, as aforesaid, continued thereafter to hold possession of its property, and to prevent it from carrying on its business; and in order to regain possession of its property, and to be enabled to resume its business, the cashier of the plaintiff was obliged to go to Austin, Tex., and there institute in one of the district courts of Travis county a suit for injunction against the defendant W. E. Hawkins, and in such suit procured a temporary injunction against said defendant Hawkins, by means of which alone it was enabled to secure possession of its property.

"By reason of the wrongful injuries and trespasses of the defendant, as aforesaid, the plaintiff was deprived of the use of its property and the privilege of carrying on its business for three days, to its actual damage the sum of $100. That on account of the trespass aforesaid it sustained actual damages in the further sum of $500. That, in order to procure possession of its property, the plaintiff was obliged to send its cashier to Austin, and his reasonable expenses, which plaintiff paid, were $40, whereby the plaintiff sustained actual damages in the further sum of $40. That to procure possession of its property it became and was necessary for the plaintiff to employ and pay attorneys to institute and prosecute said suit for injunction, and that on this account it paid out the sum of $350, which was a reasonable sum, to its actual damage in the further sum of $350. That on account of the closing of its bank, as aforesaid, and the wide and general publicity given of such closing, which publicity was given to such fact by the defendants, or at least by the defendant Hawkins, the credit, standing, and business prospects of plaintiff were greatly injured, and its prospects of carrying on a successful or profitable business, or securing deposits, were shattered and practically ruined, to the plaintiff's actual damage in the further sum of $9,010, aggregating actual damages in the sum of $10,000, which sum the plaintiff alleges it is entitled to recover of the defendants jointly and severally. And the plaintiff further alleges that because of the facts hereinbefore alleged it is justly entitled to recover of defendants exem-

plary damages, and if not entitled to recover of the defendants the several items hereinbefore alleged, to wit, $40, for expenses of its cashier to Austin, $350, paid out as attorney's fees, and $9,010 for injury to its credit, business prospects, and financial standing, as actual damages, then, in such case, the plaintiff pleads and prays to recover such amounts as exemplary damages of the defendants, and prays that it recover of defendants exemplary damages in the aggregate sum of $10,000."

The appellees, defendants below, urged a general demurrer to this petition, which was by the court sustained. The plaintiff declined to amend, and the cause was dismissed, and from that judgment this appeal is prosecuted.

[1] It appears to be conceded by counsel for appellant that the appellees were quasi judicial officers, and that their conduct in closing the bank must be regarded as having been performed while purporting to act in that capacity. In order to render a judicial or quasi judicial officer personally liable in a private action for damages resulting from his official conduct, it must appear that he transcended the limits of his power. As long as he remains within the scope of his legal authority, his motive is immaterial. Rains v. Simpson, 50 Tex. 495, 32 Am. Rep. 609; McVea v. Walker, 11 Tex. Civ. App. 46, 31 S. W. 839; Taylor v. Goodrich, 25 Tex. Civ. App. 109, 40 S. W. 515; Anderson v. Roberts, 35 S. W. 416; Throop on Public Off. § 713, and numerous cases cited in note. The case of Rains v. Simpson, supra, was one in which a sheriff sued the members of the county court for maliciously refusing to approve his bond as tax collector. After discussing the facts alleged in the petition and holding that they were insufficient to constitute a cause of action, the court said: "From the very necessity of the case, this immunity from private liability extends, not only to negligent, but willful and malicious, judicial acts. As said by Chief Justice Shaw, in Pratt v. Gardner, 2 Cush. [Mass.] 69 [48 Am. Dec. 652]: 'If an action might be brought against the judge by a party feeling himself aggrieved, the judge would be compelled to put in issue facts in which he has no interest, and the case must be tried before some other judge, who in his turn might be held amenable to the losing party, and so on indefinitely. If it be said that it may be conceded that the action will not lie, unless in a case where a judge has acted partially or corruptly, the answer is that the losing party may always aver that the judge has acted partially or corruptly, and may offer testimony of bystanders or others to prove it; and these proofs are addressed to the court and jury, before whom the judge is called to defend himself, and the result is made to depend, not upon his own original conviction (the conclusion of his own mind in the decision of the orig-

inal case), as by the theory of jurisprudence it ought to do, but upon the conclusion of other minds, under the influence of other and different circumstances.'" It often happens that the issue of authority or jurisdiction is attended with some difficulty, and its existence depends upon the happening of certain facts which must be ascertained from extraneous evidence, and about which there might be an honest difference of opinion. In such cases the administration of justice and the performance of important public duties would be seriously interfered with if the officer who is called upon to determine such questions is to act at his peril. The public interest demands that he be permitted to exercise the utmost freedom consistent with an honest endeavor to reach and announce the proper conclusion. Of course, if he should be influenced by improper or malicious motives in exceeding his authority, or knowingly do so, he could not then claim immunity from liability for such civil damages as he might wrongfully inflict. Anderson v. Roberts, 35 S. W. 416.

[2] It then follows that, in stating a cause of action for private damages against a judicial or a quasi judicial officer for exceeding the limits of his legal powers, it is essential that the petition should not only state facts which, if true would show a usurpation of authority, but should further show that such usurped authority was knowingly assumed, or that it was done in pursuance of improper or malicious motives. By this rule we think the petition in this case should be tested. In passing upon its legal sufficiency, it is necessary to examine the different provisions of the law prescribing the duties of the Commissioner of Insurance, Statistics, and History, and his subordinates.

Prior to the adoption of the amendment submitted in 1903 (Laws 1903, p. 249), article 16, § 16, of the Constitution, prohibited the creation of corporations with banking and discounting privileges. The amendment which was adopted contains, among others, the following provision: "The Legislature shall by general laws authorize the incorporation of corporate bodies with banking and discounting privileges, and shall provide for a system of state supervision, regulation and control of such bodies which will adequately protect and secure the depositors and creditors thereof." In obedience to that provision, the Legislature at its next session enacted a lengthy statute which, after providing for the incorporation of state banks and trust companies, contained numerous details for their regulation and the conduct of their business. In order to enforce the observance of those regulations and insure, as far as practicable, the safety of those who did business with such institutions, the latter were placed under the supervision of the Commissioner of Insurance, Statistics, and History.

Section 38 of the act of 1905 (Laws 1905, p. 489) says: "The Commissioner of Agriculture, Insurance, Statistics and History shall, in addition to his duties as now prescribed by law, be superintendent and inspector of all corporations incorporated under the provisions of this act availing themselves of its provisions, under the title and designation of Superintendent of Banking. He shall give, in addition to the bond now required of him by law, a bond in the penal sum of ten thousand dollars payable to the state of Texas, with two or more good and sufficient sureties, to be approved by the Governor and filed in the office of the Secretary of State, conditioned upon the faithful discharge of his duties as Superintendent of Banking," etc.

Section 39 provides: "It shall be the duty of such Superintendent at least once in each and every year, either personally or by an examiner, to visit and examine every bank and financial company organized and doing business under the provisions of this act and which shall receive deposits and which shall be included under the terms of this act 'bank,' 'trust company,' or 'savings bank,' as used in this act. The Superintendent, or person or persons appointed by him for that purpose, *shall have the power in like manner to examine any corporation incorporated under this act whenever in his judgment it may be deemed necessary or expedient*," etc.

Section 40, after providing that the Commissioner shall report certain conditions to the Attorney General, when discovered by him, for proceedings by that officer in some court having jurisdiction, continues: "If from an examination made by the Superintendent, or by one of his examiners, *it shall be discovered that any bank or trust company organized under this act is insolvent, or that its continuance in business will seriously jeopardize the safety of its depositors or other creditors, and if the action is taken from an examination by an examiner such examiner shall recommend the closing of the bank, then it shall be the duty of the Superintendent, if he approves such recommendation, by himself or one of his examiners, immediately to close said bank or trust company, and take charge of all the property and effects thereof*," etc.

Section 50, after prescribing certain limitations upon declaring dividends, contains this provision: "When the capital stock shall have become impaired to the extent of 25 per cent. thereof by reason of bad loans or otherwise, then such corporation shall cease to do business unless such capital stock shall have been made good by assessment within sixty days or reduced equal to the impairment in the manner provided in the next section."

Section 53 provides: "No incorporated bank or trust company in this state or organized under this act shall loan its money to any individual, corporation or company directly or indirectly, or permit any individual, corporation or company to become at any time indebted or liable to it in a sum exceeding 25 per cent. of its capital stock actually paid in, or permit a line of loans or credits to any greater amount to any individual or corporation," etc.

Section 73 provides: "It shall be the duty of the Superintendent once in two years, either personally or by one or more competent persons to be appointed by him, to visit and examine every savings bank in this state. The Superintendent shall have the power in like manner to examine any such corporation whenever in his judgment it may be deemed necessary or expedient," etc.

Section 80 provides: "Corporations created for the purposes mentioned in this act are hereby declared to be charged with the public use, and all banks or trust companies or corporations created under this act shall be under state control and be subject to such legislation as the Legislature may enact for the government and regulation of such banks or trust companies or corporations in this state. The rights, privileges and powers conferred by the terms of this act to corporations taking advantage thereof or incorporating hereunder, are to be held subject to the right of the Legislature to amend, alter or reform the same."

From the foregoing it seems that the Superintendent of Banking has a wide range of duties, many of which are necessarily committed to his official discretion. In the light of these statutory provisions, can it be said that the appellant's petition states facts which, if true, show that in closing the appellant bank the appellees exceeded the authority conferred on them by law? If it can be, then the judgment should be reversed; otherwise it should be affirmed. Freed from those allegations, which may properly be treated as legal conclusions, the material averments may be thus epitomized without detracting from their legal significance: (1) That, prior to March 23, 1910, the plaintiff had been incorporated under the banking laws of this state as a state bank, had received a permit to engage in the business, and was so engaged upon that date. (2) That the defendant Hawkins was at that time the legally qualified and acting Commissioner of Insurance, Statistics, and History, or Banking Commissioner, as it is sometimes termed, of this state, and that defendant Hulsey was his legally appointed deputy and an acting bank examiner. (3) That, on or about March 23, 1910, Hulsey, as such bank examiner, acting under instructions from Hawkins, officially given, took charge of the banking house and business of the appellant, closed its doors, and thereby suspended its business for a period of less than 60 days. (4) That at the time this was done the appellant was a solvent and going concern; that its business was then being conducted in a manner that did not jeopardize the safety or the security of its deposi-

tors, creditors or stockholders; that its resources consisted of divers sums of money due it from other solvent banks and bankers in the sum of $3,000, cash on hand, $225, and loans due it from solvent persons, amounting to $7,000, making a total of its resources, outside of fixtures, stationery, etc., of $10,-250; that the only liabilities against it consisted of its capital stock of $10,000 and $225 due the state banking board. (5) That the defendant Hawkins, in ordering the closing of appellant's business, acted with ill will, and for the purpose of injuring and harassing appellant and some or all of its stockholders and officers; that Hulsey, his codefendant, knew of these motives and purposes, and so knowing aided and co-operated with Hawkins in carrying out his unlawful purpose. (6) That appellant had sustained injuries, which are stated in detail, and for which it asked damages, both actual and exemplary.

[3] The effect of the demurrer in this case was to admit the truth of all the material facts alleged in the petition. If that instrument contains any averments of fact showing an excessive assumption of authority on the part of the appellees in closing the appellant bank they must be found in the fourth subdivision of the above enumeration, where it is alleged that at the time the act complained of was committed the appellant was a "solvent and going concern, and that its business was then being conducted in a manner that did not jeopardize the safety or security of its depositors or its creditors," etc. But are these sufficient?

[4] It is true the petition does allege that both of the appellees acted without authority of law. This, however, must be treated as a mere conclusion of the pleader. Whether or not these officers transcended their authority must be determined by measuring what they are charged with doing by what the law permits them to do. Hence the conclusion necessarily deduced by such a process of reasoning is one of law, and forms no part of that which is admitted by the demurrer. As we have seen, the statute authorizes the Superintendent of Banking to close a state bank or trust company under the following circumstances: When, "from an examination by the Superintendent, or by one of his examiners, it shall be discovered that any bank or trust company organized under this act is insolvent or that its continuance in business will seriously jeopardize the safety of its depositors or other creditors, and if the action is taken from an examination by an examiner and such examiner shall recommend the closing of the bank." While the petition does aver that none of these conditions did in fact exist at the time this bank was closed, it goes no further. It fails to negative the fact that any examination had theretofore been made of the bank's condition by an examiner, and that its closing had been ordered upon approval by the Superintendent of a report thereupon made. Neither does it negative the fact that the Superintendent had in person examined into the condition of the bank and the conduct of its affairs, and had discovered a situation, which, in his opinion, made it his duty under the law to close the bank.

[5] When the conduct of an officer is attacked as being in excess of the authority conferred by law, if there are any conditions under which he may exercise the powers assumed, it will be presumed, in support of the validity and regularity of his acts, that such conditions existed and formed the basis of his official conduct. City of San Antonio v. Berry, 92 Tex. 319, 48 S. W. 496; Throop on Public Off. § 558. We see no good reason why the same presumptions should not be indulged in favor of the regularity of the officer's conduct when he is sought to be held liable in an action like the present.

[6] The solvency of a bank whose only resources are its capital stock, a large portion or all of which has been loaned to private parties, and the remainder invested in other property, and the propriety of its further continuance in business, in view of the methods pursued by its officers, may be questions about which different minds might reach different conclusions. When an emergency arises in which the determination of those questions becomes essential to the performance of a public duty, they must of necessity be referred to some official or tribunal whose judgment shall be decisive. The Legislature, apparently recognizing the difficulty of providing in detail for all the contingencies which might arise in the conduct of the business of state banks and trust companies that would be calculated to jeopardize the safety and security of creditors and depositors, both present and prospective, saw fit to lodge that power or discretion with the Superintendent of Banking. When this officer in person examined a bank, it was his duty to the public to suspend its business and close its doors if, in his opinion, the bank was insolvent, or the conduct of the business was such that its continuance would jeopardize the safety and security of creditors and depositors. Again, when an examiner, after having made an examination, made a report to the Superintendent which revealed such conditions, and recommended the closing of the bank, the law made it the duty of the Superintendent, if he approved the report, to order the business suspended and the bank closed. Such a provision of the law clothed the Superintendent with judicial functions. When such a report was made, clearly he had the power to direct the closing of the bank or not, as his judgment might dictate; or, even without such a report, he had the right to in person enter upon the inquiry into the bank's condition, and determine for himself whether or not it was solvent, or if its business was being properly

conducted. And if he determined either of these questions against the bank, it was his duty to close its doors and suspend its business. The existence of a power is one thing; the propriety of its exercise under given conditions is another. Clearly, if he had the right to determine the propriety of closing the doors, he also had the power to carry his judgment into effect. It would be useless to clothe an officer with powers to judicially determine a question, and provide no means for enforcing his judgment. If he closed the bank at a time when it was not insolvent, and when its business was in all things being properly conducted, his action would be simply erroneous, and not in excess of his actual authority.

It is argued that this construction of the law and the immunity which it provides from personal liability for arbitrary conduct on the part of such officials constitute a serious menace to the safety of important business institutions. That may be true. Whether or not such power should have been reposed in the Superintendent of Banking is a matter with which the Legislature had the exclusive right to deal, and presents no question for the courts. But whether or not a public officer having such discretionary powers, and charged with such public duties, should be held personally liable in a private action for damages for an alleged abuse of his authority presents a question of public policy, and falls properly within the sphere of the courts, and is one which must be disposed of with due regard to the public welfare. Corporations endowed with banking privileges are indispensable agencies in carrying on the commerce of the country. In the course of business, they become the depositories of millions of dollars in money from all ranks of society, and from people who have no means of knowing the condition or the solvency of the institutions with which they deal, and who must rely upon the fidelity of the state's officers charged with their supervision and control. The Legislature recognized that adequate supervision and protection could not be given without reposing in some one the discretion to act in emergencies, when the conditions, if permitted to continue, were such as might endanger the safety of depositors and creditors. Under the present law, the Superintendent stands between the public and the mismanagement of the institutions he is to supervise and inspect, charged with the duty of protecting those who trust their funds in such keeping. His power may be large, and when abused may cause serious private inconvenience and damage to banks; but his duties are grave, and his responsibilities are great. The public disaster likely to follow a failure upon his part to exercise his authority at the proper time outweighs the private injuries which his unwarranted action might entail. The policy which the courts adopt in granting this immunity to public officials is, not to shield the author of tyrannical and despotic conduct, but to protect the upright and conscientious officer in the unhampered exercise of that power by which the state safeguards the interest of the public. Obviously it is the purpose of the law, not only to have the Superintendent interfere when the conditions and the conduct of the business of banking institutions have grown unsafe, but also when, in his judgment, the manner in which the business is being conducted will lead to unsafe conditions. Such an officer would indeed fall short of his public duty if he waited till the wolf had actually attacked the fold before he gave the alarm. As the watchman on guard, he should look for his coming, and cry out at a time when danger may be averted.

Believing, as we do, that, in failing to allege facts showing that the appellees exceeded the authority conferred by the law under which they purported to act in closing the appellant bank, the petition has stated no grounds for holding either of them personally liable for the injuries which are claimed, we conclude that the demurrer was properly sustained. Under the authorities previously referred to, if the Superintendent and the examiner acted within the powers conferred upon them by law, they cannot be held liable for their arbitrary conduct, even though prompted by improper motives.

The judgment of the district court is accordingly affirmed.